*Eastern District of Kentucky*
*FILED*
*NOV 18 2021*
*AT FRANKFORT*
*ROBERT R. CARR*
*CLERK U.S. DISTRICT COURT*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### FRANKFORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. Katharine Coale, PMHNP<br><br>Plaintiff,<br><br>v.<br><br>EDGEWATER RECOVERY CENTER, LLC, (dba BLUE SKY RECOVERY CENTER)<br><br>and<br><br>ACCULAB, LLC (dba Thoroughbred Diagnostics)<br><br>and<br><br>READY LAB, LLC<br><br>Defendants. | CIVIL ACTION NO. _3:21-CV-56-GFVT_<br><br>**FILED IN CAMERA AND UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730(b)(2)<br><br>**JURY TRIAL DEMANDED** |

\* \* \* \* \* \* \* \*

## VERIFIED QUI TAM COMPLAINT AND JURY TRIAL DEMAND

COMES NOW, through the undersigned counsel, Relator Katharine Coale, PMHNP, on behalf of herself and the United States of America ("United States"), and brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") to recover monetary damages, civil penalties, and all other remedies for fraud and other violations against federally funded organizations/programs, Operation UNITE and the Kentucky Opioid Response Effort (KORE), and federal health care programs, which include Medicare, Medicaid, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS/TRICARE"), the Veterans Administration, the Federal Employee

Health Benefits Program, and all others (collectively, "federal health care programs"), and hereby alleges as follows:

## I.     NATURE OF THE ACTION & PRELIMINARY STATEMENT

1.     The FCA allows a private person with knowledge of a fraud against federal agencies or programs to bring an action in federal district court for himself/herself and for the United States and States and to share in any recovery. Such an action is known as a *qui tam*, which is derived from the Latin phrase, *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("who as well for the king as for himself sues in this matter"). The party bringing such a suit is known as a Relator.

2.     In this *qui tam*, Relator alleges that, beginning from July 13, 2017, and continuing to the present, Defendants Edgewater Recovery Center, LLC (hereinafter "Edgewater"), AccuLab, LLC (d/b/a Thoroughbred Diagnostics and hereinafter "Thoroughbred"), and Ready Lab, LLC (hereinafter "Ready Lab") knowingly presented and caused to be presented false and fraudulent claims and statements that were material to the government's decision to reimburse payment of claims for urine drug testing.

3.     Relator further alleges that, during that same time frame, Defendant Edgewater falsified patient diagnoses, courses of treatment, locations, and disease states, among other things, in order to falsely obtain grant or voucher payments from Operation UNITE and the Kentucky Opioid Response Effort (KORE) for substance abuse treatment that, but for the fraud, would not have been subject to federal program funding or reimbursement.

### A.  Urine Drug Testing

4.      On July 13, 2017, Edgewater Recovery Center, LLC was registered with the Kentucky Secretary of State.  Since that time, it has operated residential and outpatient recovery centers in the Commonwealth of Kentucky.  In approximately August 2018, Edgewater received a license to operate as a behavioral health services organization (BHSO).

5.      The urine drug tests at issue in this case were not ordered by medical practitioners who were actually providing medical treatment for addiction and were ordered in routine, blanket ways that violate federal health care programs' regulations.  Accordingly, the tests did not meet Medicare and Medicaid's requirements that, to be covered, the tests must be reasonable and necessary for the diagnosis or treatment of a specific medical problem and ordered and used by a physician who is treating the patient for that medical problem.  *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); *see also* 907 KAR 3:005, Section 3; 907 KAR 3:130, Section 2.

6.      The tests were also not tailored to the specific needs of any particular patient/client; rather, a one-size-fits-all method of testing was applied that tended to prioritize the monetization of the delivery of healthcare, in this case testing services, over the actual care, treatment, and recovery of patients.

7.      During portions of the relevant period, which spans from Edgewater's creation on July 13, 2017, to the present, Thoroughbred provided urine drug testing services to clients at Edgewater's Paducah, Flemingsburg, Pikeville, and Morehead, Kentucky facilities.  Ready Lab provided urine drug testing services to clients at Edgewater's facilities from the time of the clinical laboratory's inception in 2020 to the present.

8.      As is described in more detail below, each of Edgewater's locations used urine drug testing as part of their programs.  Urine drug tests were often performed for non-

3

medical reasons. Such reasons included, for example, ensuring sobriety, which was often a condition of participation or residency in Edgewater's programs; promoting client accountability; ensuring client safety; and complying with referral arrangements Edgewater had with the Kentucky Department of Corrections and/or Kentucky courts. As is set forth in more detail herein, below, federal health care programs do not pay for court-ordered or legal-related drug testing.

9.     Moreover, whether or not the patient was court-ordered to Edgewater, the urine drug testing at Edgewater was not ordered by a medical provider who was treating clients for a specific medical problem, like a substance use disorder. Indeed, the systems put in place by Defendants resulted in urine collectors who had no medical training and, themselves, were in some state of addiction recovery, exercising decision-making authority about which clients would be tested, when, and to what extent. No provider reviewed a specific patient chart, considered a disease state, consulted a treatment plan, exercised medical judgment, and made a client-specific decision to order a urine drug test as a means of diagnosing or treating an addiction or other disease. And once completed, the test results were not reviewed or used by medical providers for medical diagnosis or treatment of Edgewater's clients.

10.    The system implemented jointly by Edgewater, Ready Lab, and Thoroughbred paid no mind to the qualitative testing that was routinely ordered. Indeed, Ready Lab's results were often so slow as to be of little-to-no value. Thoroughbred often completed the more thorough (albeit often unnecessary) quantitative testing before Ready Lab had even tested the counterpart sample on a qualitative basis. Quantitative testing provides what amounts to qualitative-plus testing (*i.e.*, quantitative tests tell not only whether a substance is present in the urine sample, but also how much of that substance is present).

The systematic, blanket application of 60-plus panel quantitative testing to every Edgewater client urine sample rendered every qualitative test run by Ready Lab or Thoroughbred wholly unnecessary and redundant.

11.     For all the reasons set forth herein, Edgewater, Thoroughbred, and Ready Lab knew, recklessly disregarded, or deliberately ignored: (1) that the urine drug testing of Edgewater clients was not performed for purposes of medical diagnosis or treatment; (2) that practitioners who purportedly authorized the standardized order forms and tests were not providing medical treatment for substance use disorders to the clients and were not using the results of the urine drug tests for medical purposes; and (3) that practitioners who purportedly authorized the standardized order forms and tests were not providing medical treatment for substance use disorders to the clients, were not, themselves, overseeing or providing care to the clients, were not ordering the tests in client-centric ways, and were not using the results of the urine drug tests for necessary and appropriate medical purposes.

12.     Nonetheless, Thoroughbred and Ready Lab submitted claims for the urine drug tests performed for Edgewater's clients to the Medicare and Kentucky Medicaid programs.  These claims were false because the tests were medically unnecessary and performed pursuant to improper blanket orders signed (or purportedly signed) by a medical practitioner who was not providing medical treatment for substance use disorders to the clients, not actually treating the clients at all, or not using the test results for purposes of medical diagnosis or treatment.

13.     As a result of the false claims Thoroughbred and Ready Lab submitted, and Edgewater caused them to submit, the Medicare and Kentucky Medicaid programs, among other federal health care programs, paid, upon information and belief, millions of dollars in reimbursements to which the claimants were not entitled.

**B.  Federal Grant Fraud**

14.     In response to the devastating opioid epidemic in Kentucky, federal agencies such as United States Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA) provide federal grant funds earmarked for combatting the opioid crisis through the provision of substance abuse treatment services.

15.     The Kentucky Opioid Response Effort (KORE) and Operation UNITE are two such programs or agencies that utilize grants from the Department of Health and Human Services to fund drug treatment efforts in areas of Kentucky that have been hit hardest by the opioid epidemic.

16.     KORE uses grant funds it receives to pay for inpatient and outpatient treatment of patients suffering from opioid use disorder.  Operation UNITE uses grant funds to further its treatment voucher program across UNITE's 32-county catchment area in  Southeastern  Kentucky.   KORE  and  UNITE  sometimes  cooperate  in  their implementation of funding initiatives designed to expand access to treatment for opioid users.  For example, certain KORE funding applications are given to representatives of UNITE for vetting and/or approval.

17.     Edgewater has implemented a system whereby it falsely applies for funding from KORE and/or UNITE to pay for or subsidize drug treatment for Edgewater's clients. More specifically, Edgewater falsely asserts on funding applications that its patients suffer from opioid use disorder when many do not so suffer; falsely asserts that its patients are undergoing Medication Assisted Treatment (MAT) (which generally involves methadone or buprenorphine treatment) when they are not; and falsely suggests that its patients are eligible for grant/voucher funding even though the patients do not reside in counties served by the program.   These practices result in the submission of applications for grant-traceable

6

funding and payment of those funds to Edgewater that, if the funding program knew the truth of the situations falsely depicted on the applications, would never be paid.

## II.    JURISDICTION AND VENUE

18.    This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks remedies on behalf of the United States for Defendants' violations of 31 U.S.C. § 3729 that occurred in the Eastern District of Kentucky.

19.    This Complaint is filed within the period prescribed by 31 U.S.C. § 3731(b). There was no public disclosure of the allegations or transactions set forth in this action prior to filing under 31 U.S.C. § 3730(e).

20.    This Court has personal jurisdiction over the Defendants and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because at least one of the Defendants can be found in, resides, transacts or has transacted, or is qualified to do business in this District.  In addition, during the period challenged by this action, each Defendant regularly conducted business in this judicial district, including the medically unnecessary tests and other acts detailed herein.  Among their many acts, Defendants submitted claims for reimbursement or grant-backed payments to agencies with billing, processing, business, and payment operations based in Frankfort, Kentucky.

## III.    PARTIES

### A.  Plaintiff

21.    Plaintiff United States of America brings this action by and through its administrative agencies, the United States Department of Health and Human Services,

Centers for Medicare & Medicaid Services ("CMS") and United States Department of Health and Human Services, Substance Abuse and Mental Health Services Administration ("SAMHSA"). CMS is responsible for the administration of all federal health care programs. At all times relevant to this Complaint, the United States funded the provision of medical care for eligible patients of Defendants pursuant to the Medicare program and other programs administered by CMS. At all times relevant to this Complaint, SAMHSA funded and administered certain grant programs designed to treat opioid use disorder in the United States. At all relevant times, SAMHSA or its parent agency, the United States Department of Health and Human Services, funded the treatment of opioid use disorder through grants the agency made to partner agencies in numerous states and Edgewater applied for compensation for purported client care from those grant funds.

**B. Relator**

22.     Relator Katharine Coale, PMHNP, holds a bachelor of arts degree from Rhodes College, an associate's degree in nursing from West Kentucky Community and Technical College, a master of science degree in nursing with a focus on psychiatric mental health from Vanderbilt University, and has pursued additional graduate-level studies at Murray State University. She worked as a clinical liaison for a health technology firm prior to obtaining her master's degree in nursing from Vanderbilt, at which time she became board-certified as a psychiatric mental health nurse practitioner (PMHNP).

23.     In 2020, Ms. Coale engaged in discussions with one of Edgewater's owners, John David Elam, about partnering with Edgewater to open a Paducah, Kentucky facility. When discussions about her having an ownership stake in the Paducah location stalled, Ms. Coale agreed to instead go to work for Edgewater as the "Program Director" of the yet-to-be-opened Paducah location, which would eventually open to the public in January 2021 and

become known as "Edgewater West." By virtue of her many conversations with Mr. Elam about Edgewater's business model, policies, procedures, personnel, billing, etc., plus her firsthand experiences, observations, and conversations during her term of employment (which spanned September 2020 to October 2021), Katharine Coale became aware of the matters set forth in this Complaint.

24.     In early-October 2021, after being consistently ignored, marginalized, and rebuffed whenever she raised the concerns set forth in this Complaint, Relator tendered her resignation, effective October 31, 2021. A few days after her resignation but before its effective date, Edgewater terminated Relator, citing her alleged operation of a competing business in violation of her non-compete agreement with Edgewater. In truth, Relator was not then, nor is she now operating a competing entity of any kind.

25.     Tellingly, representatives of Edgewater threatened that the company would use Relator's non-compete agreement to prevent her from working near her home. They offered to rescind the non-compete agreement if Relator would only sign a non-disclosure agreement that, by its terms, prevented her from coming forward with her instant allegations and concerns. Relator refused to make that corrupt trade.

**C. Defendants**

26.     Articles of organization for Edgewater Recovery Center, LLC were filed with the Kentucky Secretary of State on July 13, 2017. According to its 2021 annual report, the company has three members: John David Elam, Keith Randall Risner, and Barry Crum. Mr. Elam is listed as the company's registered agent and its principal place of business is listed as 259 Old Flemingsburg Road, Morehead, Kentucky 40351. At all relevant times, Edgewater operated residential and outpatient drug rehabilitation facilities in one or more of the following Kentucky cities: Paducah, Flemingsburg, Pikeville, and Morehead. At

Morehead, Edgewater operated men's facilities under the Edgewater moniker and separate women's facilities under the assumed name "Blue Sky Recovery Center," which was adopted pursuant to a certificate of assumed name filed on Edgewater's behalf with the Kentucky Secretary of State on July 10, 2019.

27. Articles of organization were filed with the Kentucky Secretary of State on behalf of AccuLab, LLC on May 13, 2015. According to its 2021, annual report, the company has four members: William Brandon Woodward, Laurence J. Zielke, Rana Mays, and E. Alvin Fletcher. Its registered agent is Laurence Zielke and its principal address is 1051 Bryant Way, Bowling Green, Kentucky 42103. On April 26, 2018, AccuLab, LLC filed a certificate of assumed name with the Kentucky Secretary of State indicating that the company would begin operating under the name Thoroughbred Diagnostics. At all relevant times, AccuLab/Thoroughbred operated a clinical laboratory that offered urine drug testing services.

28. Articles of incorporation were filed on behalf of Ready Lab, LLC with the Kentucky Secretary of State on June 15, 2020. According to its 2021 annual report, the company has one member, Dr. Fadi Bacha. Its principal address listed on Secretary of State records is 3116 Harrodsburg Road, Lexington, Kentucky 40503. Beginning around the time of the company's formation, Ready Lab operated a clinical laboratory that offered urine drug testing services. Notably, Ready Lab's National Provider Identifier (NPI) registration lists John David Elam as the company's "Authorized Official" and its "Member." Despite listing its principal address as being in Lexington, Ready Lab's NPI registration information indicates its mailing address and physical location are both 2575 KY HWY 801 North, Suite B, Morehead, Kentucky 40351.

## IV.   BACKGROUND

### A. The False Claims Act

29.     The False Claims Act ("FCA") was originally enacted in 1863 to address fraud on the Government during the Civil War.   It reflects Congress's long-standing objective to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." *See* S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

30.     As relevant here, the FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).

31.     Under the FCA, "knowingly" is defined to mean that with respect to information, a person (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).  The FCA does not require that a defendant have a specific intent to defraud the federal government.  31 U.S.C. § 3729(b)(1)(B).

32.     For each violation of the FCA, a defendant is liable to the United States for civil penalties of not less than $5,000 and not more than $10,000 per false claim, as adjusted for inflation,[1] and three times the amount of damages that the Government sustained as a result of the defendant's actions.  31 U.S.C. § 3729(a)(1).

---

[1] Under the FCA, as adjusted by applicable federal laws and regulations, civil penalties for violations occurring between September 29, 1999 and November 1, 2015 are $5,500 to $11,000. *See* 64 Fed. Reg. 47,099, 47,104 (1999). Civil penalties for violations occurring after November 1, 2015 are $11,665 to $23,331. *See* 85 Fed. Reg. 37004, 37006 (2020).

**B. The Government Programs at Issue**

**i. The Medicare Part B Program**

33.     The United States, through HHS, administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act (the "Medicare Part B Program"). HHS has delegated the administration of the Medicare Part B Program to its component agency, the Centers for Medicare and Medicaid Services ("CMS").

34.     The Medicare Part B Program is a federally subsidized health insurance program providing benefits to persons who are 65 years of age or older, persons with permanent kidney failure, and persons receiving Social Security disability benefits.

35.     Individuals who qualify for Medicare Part B benefits are commonly referred to as "beneficiaries."

36.     The Medicare Part B Program is funded by contributions from the federal treasury and by insurance premiums paid by beneficiaries.

37.     Medical service providers, including clinical laboratories meeting certain criteria, can enroll in and obtain Medicare provider numbers. Upon enrollment, providers may provide medical services to beneficiaries and seek reimbursement from the Medicare Part B Program for the services they rendered, so long as the services were rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement.

38.     During the relevant period, AccuLab d/b/a Thoroughbred Diagnostics (CMS Certification #18D2098942) and Ready Lab (CMS Certification #18D2197959) were enrolled providers in the Medicare Part B Program.

39.     In connection with their respective enrollments, each company submitted a Medicare Enrollment Application (CMS Form-855B). In Section 15 of the Application, each company agreed to be bound "to the laws, regulations, and program instructions of the Medicare program."

### ii.     The Kentucky Medicaid Program

40.     HHS, through CMS, also administers the Medicaid program at the federal level. The Medicaid program was created under Title XIX of the Social Security Act to provide federally subsidized health insurance to certain groups—primarily the poor and disabled. In Kentucky, the Medicaid program was established pursuant to KRS Chapter 205 and administrative regulations set forth in 907 KAR Chapters 1 through 23 (the "Kentucky Medicaid Program;" with the Medicare Part B Program, the "Government Healthcare Programs"). The Kentucky Cabinet for Health and Family Services, Department for Medicaid Services, administers the Kentucky Medicaid Program.

41.     Individuals who qualify for Medicaid benefits are commonly referred to as "members."

42.     Funding for Medicaid is shared between the federal Government and those states participating in the Medicaid program. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b). Presently in Kentucky, approximately 78.95% of each dollar spent by the Kentucky Medicaid Program is contributed by the federal Government.

43.     Medical service providers, including clinical laboratories meeting certain criteria, can enroll in and obtain Medicaid provider numbers. Upon enrollment, providers may provide medical services to members and seek reimbursement for the services they

rendered, so long as the services were rendered in compliance with the laws, rules, regulations, policies, and procedures governing reimbursement.

44.     During the relevant period, AccuLab d/b/a Thoroughbred Diagnostics and Ready Lab were enrolled providers in the Kentucky Medicaid Program.  In their Provider Agreements with the Kentucky Department for Medicaid Services, both companies agreed to comply with the rules and regulations of the Kentucky Medicaid Program.

45.     The Kentucky Department for Medicaid Services contracts with managed care organizations ("MCOs") to manage the care of Medicaid members.  For providing these services, the MCOs receive payments from the Kentucky Medicaid Program, which in turn is funded by the federal Government and the state (as described above).

46.     Healthcare providers must be enrolled with the MCOs to receive reimbursements for services rendered to members enrolled in the MCOs' plans.  In their agreements with providers, the MCOs require providers to comply with the rules and regulations of the Kentucky Medicaid Program.  The MCOs may also impose additional coverage requirements prior to reimbursing services.

47.     During the relevant period, AccuLab d/b/a Thoroughbred Diagnostics and Ready Lab were enrolled with numerous MCOs contracted with the Kentucky Medicaid Program.

C. **The Claims Submission Process**

48.     Throughout the relevant period, Ready Lab and Thoroughbred submitted claims for reimbursement to the Medicare Part B Program through a Medicare Administrative Contractor (or "MAC"), which contracted with CMS to process and pay claims for Medicare Part B services.  Upon information and belief, the MAC with

responsibility for processing and paying Thoroughbred and Ready Lab's claims to Medicare Part B was CGS Administrators, LLC ("CGS").

49.     Ready Lab and Thoroughbred submitted claims to Medicare electronically after submitting an Electronic Data Interchange Enrollment Form to CGS. By signing the Enrollment Agreement, Ready Lab and Thoroughbred agreed that they would "submit claims that are accurate, complete, and truthful," and that "all claims will be paid from Federal funds, that the submission of such claim is a claim for payment under the Medicare program."

50.     Throughout the relevant period, Ready Lab and Thoroughbred submitted claims to the Kentucky Medicaid Program through the Department for Medicaid Services or through the MCOs with which Ready Lab and Thoroughbred were enrolled as a Medicaid provider.

51.     Claims for payment submitted to MCOs are "claims" under the FCA because the MCO is a "contractor, grantee, or other recipient," the money is being used "to advance a Government program or interest," and the Government provides or has provided a portion of the money requested. *See* 31 U.S.C. § 3729(b)(2)(A).

52.     At times, Ready Lab and Thoroughbred submitted claims to the Kentucky Medicaid Program using a standardized paper claim form known as the CMS-1500. At the time each claim form was submitted, both companies certified that the services for which they sought payment "were medically indicated and necessary to the health of the patient . . ." It also certified that all information provided "is true, accurate and complete," and acknowledged that it understood "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

15

53.    As an alternative to use of the paper CMS-1500 claim forms, Ready Lab and Thoroughbred submitted claims to the Kentucky Medicaid Program electronically after signing an addendum to its provider agreement called a MAP-380 form. Ready Lab and Thoroughbred acknowledged that their signatures on the MAP-380 forms "constitutes compliance with the following certification required of each individual claim transmitted by electronic media . . . that the transmitted information is true, accurate, and complete."

54.    Providers like Ready Lab and Thoroughbred include certain information on each claim submitted to the Government Healthcare Programs. Among other information, providers include (a) Current Procedural Terminology codes or Healthcare Common Procedure Coding System codes that identify the services rendered and for which reimbursement is sought; (b) diagnosis codes to describe the patients' diagnosis or condition; and (c) the unique billing identification number of the ordering provider, meaning the medical practitioner who ordered the tests or services rendered.

55.    At all times relevant, Ready Lab and Thoroughbred submitted claims for urine drug tests to the Government Healthcare Programs for reimbursement.

56.    Ready Lab and Thoroughbred received reimbursements from the Government Healthcare Programs based on these claims.

### D. The Government Healthcare Programs' Coverage Requirements for Urine Drug Testing Services

57.    Urine drug testing is used to determine the presence or absence of a drug or its metabolites in a patient's body. In the clinical healthcare context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing unprescribed drugs.

58.    The Government Healthcare Programs' laws, regulations, and program instructions make clear that the Programs only pay for urine drug tests that (1) are

reasonable and necessary for the diagnosis or treatment of a beneficiary's illness; (2) are ordered and their results used by a physician (or other medical practitioner) who is treating the beneficiary for a specific illness or injury; and (3) are performed pursuant to an order individualized to the beneficiary's specific needs.

### i. Medicare Coverage of Urine Drug Testing Services

59.     The Medicare Part B Program pays for clinical laboratory tests, including urine drug tests, that meet Medicare's coverage requirements.  42 C.F.R. § 410.32(d); *see also* Medicare Benefit Policy Manual Ch. 15 § 80.1.  Conversely, it does *not* pay for tests that do *not* meet the coverage requirements.

60.     A fundamental requirement for Medicare's coverage of services, including clinical laboratory tests, is that such services are medically necessary.  Under the Medicare Part B Program, Congress expressly prohibited, by statute, reimbursement "for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ."  42 U.S.C. § 1395y(a)(1)(A).

61.     In the context of laboratory testing, including urine drug testing, the relevant regulations explain that to meet the medical necessity requirement, tests "must be ordered by the physician[2] who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  42 C.F.R. § 410.32(a).

---

[2] The regulation applies to non-physician practitioners such as nurse practitioners and physician assistants. 42 C.F.R. § 410.32(a)(2).

62.     Medicare has provided guidelines and instructions to providers like Ready Lab and Thoroughbred regarding specific aspects of their obligation to comply with the medical necessity requirement.

63.     In the context of laboratory testing, the Medicare Benefit Policy Manual states the testing must be ordered, and its results used promptly by, the physician who is treating the beneficiary for a specific medical problem.  Medicare Benefit Policy Manual, Chapter 15 § 80.1.

64.     The Medicare contractor CGS has published a Local Coverage Determination ("LCD")[3] explaining the physician order requirement for urine drug testing. The LCD titled "Controlled Substance Monitoring and Drugs of Abuse Testing (L36029)" (hereinafter "LCD L36029") defines "blanket order" as a "[t]est request that is not for a specific patient; rather, it is an identical order for all patients in a clinician's practice without individualized decision making at every visit."  The LCD explicitly states that urine drug tests performed pursuant to "blanket orders" are "non-covered services."

65.     LCD L36029 also explicitly states that urine drug tests "for medico-legal . . . purposes" are "non-covered services."

66.     The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories in the Federal Register explaining the physician order requirement for laboratory testing. 63 Fed. Reg. 45076 (Aug. 24, 1998).  The Guidance notes that laboratories, like Ready Lab and Thoroughbred, should construct order forms "to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

---

[3] An LCD is a contractor's decision about whether a particular item or service is considered reasonable and necessary within its jurisdiction. *See* Social Security Act § 1869(f)(2)(B).

### ii.     Kentucky Medicaid Program's Coverage of Urine Drug Testing Services

67.     The Kentucky Medicaid Program pays for clinical laboratory tests, including urine drug tests, that meet the Kentucky Medicaid Program's coverage requirements. *See* 907 KAR 1:028, Section 2.  Conversely, it does *not* pay for tests that do *not* meet the coverage requirements.

68.     Like Medicare, the Kentucky Medicaid Program only pays for services that are medically necessary.  907 KAR 3:005, Section 3.  A service is medically necessary if, *inter alia*, it is (a) based on an individualized assessment of the recipient's medical needs; (b) reasonable and required to identify, diagnose, or treat a disease, illness, or other medical condition; (c) appropriate in terms of the service, amount, scope, and duration based on generally accepted standards of good medical practice; and (d) provided for medical reasons rather than primarily for the convenience of the individual, the individual's caregiver, or the health care provider.  *See* 907 KAR 3:130, Section 2.

69.     The Kentucky Medicaid Program's regulations explicitly prohibit reimbursement for clinical laboratory tests, including urine drug tests, that were ordered by a court.  *See* 901 KAR 1:028, Section 3.

70.     The MCOs, responsible for managing the care of the members of the Kentucky Medicaid Program, issue their own coverage guidelines.

71.     For example, Humana's Medical Coverage Policy for Drug Testing states that urine drug testing may be eligible for reimbursement if the "[d]rug testing is tailored to the individual," among other criteria. The coverage policy further states that "[r]outine, nonspecific standing orders for panel testing," "[t]esting for . . . medico-legal purposes (i.e., court-ordered drug screening)," and "[t]esting for sociologic determinants (i.e., housing)" "may **NOT** be eligible" for reimbursement. (emphasis in original).

72.     Humana's Kentucky Medicaid Medical Policy Statement expressly states that urine drug testing performed pursuant to "blanket orders" will not be reimbursed, nor will urine drug testing performed as a "[p]rogram requirement to stay in a residential facility or sober center."

73.     United Healthcare Community Plan's Kentucky Medicaid Drug Testing Policy states, "Drug testing services that are determined to be court ordered and/or funded by a county, state, or federal agency will continue to be denied."

74.     Passport's Urine Drug Test Standards/Requirements state that, "For each [urine drug test] ordered, . . . the [urine drug test] must be a necessary part of the member's individualized treatment plan . . . . Standing orders for specific test panels across members . . . do not meet medical necessity criteria as they are not individualized to members' specific medical needs." The guidance also explicitly stated that, "Passport will not reimburse urine drug testing for . . . legal purposes."

75.     Wellcare's Clinical Coverage Guideline for Drug Testing states that, "As a general rule, . . . [t]esting should be based on medical necessity and a complete clinical assessment of the individual's risk potential for abuse and diversion. . . ." Wellcare's policy also states that testing "is excluded from coverage if performed for . . . legal purposes." In addition, it states that tests "are not medically reasonable or necessary, and therefor[e] are excluded from coverage" if performed pursuant to "Blanket Orders," or pursuant to "[r]outine standing orders for all patients in a physician's practice," or performed for "medico-legal" purposes. Wellcare's policy also makes clear that, "[t]esting for residential monitoring" [and] "[c]ourt ordered drug testing" is "not covered."

### E. Operation UNITE and the Kentucky Opioid Response Effort (KORE)

76.     Operation UNITE was launched in 2003 by Congressman Harold "Hal" Rogers in response to the opioid crisis in his Fifth Congressional District. UNITE serves 32 counties in Southeastern Kentucky and operates on a blend of funding from the Kentucky General Assembly, individual contributions, corporate donations, and, most relevant here, governmental grants, such as funds UNITE has received from the United States Department of Health and Human Services. Through UNITE's Treatment Voucher Program, low-income residents living within UNITE's 32-county service region may qualify for financial assistance to obtain long-term residential treatment for substance use disorder. UNITE will pay a provider $100 per day for 90 days of residential treatment for adults and juveniles. Under certain circumstances, UNITE will extend an additional 90 days of treatment voucher coverage at the rate of $50 per day. The maximum value of a UNITE Treatment Voucher is $13,500 for 180 days of residential treatment. As of May 2021, clients have been eligible to receive a second voucher in the face of relapse or failure to complete the first course of treatment.

77.     In order to qualify for a UNITE Treatment Voucher, applicants must, among other things, meet income guidelines and verify that they have been a resident of the UNITE Service Area within the preceding 30 days.

78.     The Kentucky Opioid Response Effort (KORE) seeks to expand and sustain comprehensive, equitable recovery-oriented systems of care to end the opioid epidemic in Kentucky. Through federal funding from the United States Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA), KORE, among other things, funds substance abuse treatment via the KORE Treatment

Access Program. KORE is operated by the Kentucky Cabinet for Health and Family Services and is undeniably an opioid-centric program.

79.     Applications for KORE Treatment Access Program funds must be filled out by the treatment provider seeking KORE funding. The application requires the provider to select from a menu of six categories of funding eligibility: Residential Treatment; Room and Board; Intensive Outpatient; Childcare; Transportation; and MAT (or Medication Assisted Treatment). Directly above the menu of funding categories, the application states in emboldened print, "Based on the client's eligibility and clinical assessment, I am requesting approval for submitting a Monthly Treatment Reimbursement Request Form for the following services:". Immediately below the funding menu, the application, again in emboldened print, states, "By submitting this Provider Application Sheet for New Client, I certify that this client meets the qualifications and guidelines for the KORE Treatment Access Program, and the Treatment Support Program is the payer of last resort."

80.     KORE and UNITE sometimes collaborate to ensure efficient allocation of treatment funding resources.

## V.   **DEFENDANTS' FCA VIOLATIONS**

81.     The allegations set forth elsewhere in this Complaint are restated and incorporated herein by reference.

82.     In 2020, Relator engaged in discussions with one of Edgewater's owners, John David Elam, about partnering with Edgewater to open a Paducah, Kentucky facility. Those discussions involved Mr. Elam describing Edgewater's facilities, corporate and management structure, billing practices, payor mix, staffing strategies, and other intimate details about Edgewater's programs. When discussions about her having an ownership stake

in the Paducah location stalled, Ms. Coale agreed to instead go to work for Edgewater as the "Program Director" of the Paducah location.

83.     Relator started her work at Edgewater in September 2020, assisted with the Paducah location's development, was present for that facility's public-facing opening in January 2021, and worked there steadily until October 2021. Throughout her employment, she inquired and complained to Edgewater management and ownership about the matters set forth in this Complaint. Each time, she was ignored, marginalized, or rebuffed.

84.     Among the many Edgewater-centric matters about which she became familiar during her employment and lead-up thereto, Relator learned that, despite its multiple locations, Edgewater was run corporately from its main locations in Morehead. Policies, practices, staffing strategies, billing, and all other important functions were standardized across Edgewater's state-wide footprint. Records, forms, procedures, policies, and the like were virtually identical from location to location. Although many of her experiences occurred at Edgewater's Paducah location, her understanding is not limited solely to that facility and the fraudulent urine drug testing connected to Edgewater, Thoroughbred, and Ready Lab occurred company-wide, not just at Paducah. Edgewater's fraudulent grant practices, too, were company-wide.

**A.     Urine Drug Testing**

85.     During the period relevant to the instant Complaint, which spans from Edgewater's creation on July 13, 2017, to the present, Thoroughbred provided urine drug testing services to clients at Edgewater's Paducah, Flemingsburg, Pikeville, and Morehead, Kentucky facilities. (At Morehead, Edgewater operated men's facilities under the Edgewater moniker and separate women's facilities under the assumed name "Blue Sky Recovery Center." The Blue Sky patients, hereinafter simply referred to corporately as Edgewater

patients, also received the above-referenced urine drug testing services from Thoroughbred and Ready Lab in manners consistent with the allegations contained herein.)   Ready Lab provided urine drug testing services to clients at Edgewater's facilities from the time of the former's inception in 2020 to the present.

86.    Urine drug tests were often performed by Ready Lab and Thoroughbred upon samples from Edgewater's clients for non-medical reasons.  Such reasons included, for example, ensuring sobriety, which was often a condition of participation or residency in Edgewater's programs; promoting client accountability; ensuring client safety; and complying with referral arrangements Edgewater had with the Kentucky Department of Corrections and/or Kentucky courts.

87.    Clients placed into Edgewater's programs by state or federal court judges and/or the Kentucky Department of Corrections (often through its Division of Probation and Parole) were subjected to the standardized testing protocols described throughout this Complaint.  As is detailed herein, above, federal programs such as Medicare and Kentucky Medicaid do not reimburse for such tests and they are not medically necessary. Nevertheless, and consistent with the patterns and practices described herein, claims for reimbursement of such tests were routinely submitted to federal programs such as Medicare and Kentucky Medicaid.  Relator estimates that as many as 80% or more of Edgewater Paducah's clients, for example, were, at any given time, court-ordered to participate in Edgewater's program as a condition/consequence of a criminal case.  Clients often arrived at Edgewater via direct transport from local jails.  Edgewater's other locations had similar mixes of court-ordered or corrections-ordered clients that were treated and billed similarly.

88.    As Exhibit 1 illustrates, Patient L.M. was convicted of a methamphetamine-related offense in McCracken Circuit Court in Paducah, Kentucky.   (He was actually

sentenced simultaneously for multiple methamphetamine-related cases.)   Pursuant to a criminal judgment entered on March 17, 2021, which memorialized a sentencing hearing that occurred on March 11, 2021, L.M. was ordered to undergo a drug and/or alcohol assessment, submit to random drug testing, and attend any treatment recommended by the Kentucky Department of Corrections, Division of Probation and Parole.   Thereafter, L.M. was enrolled at Edgewater's Paducah location.   Exhibit 2 shows steady billing of United Healthcare Community Plan, a Kentucky Medicaid MCO, by AccuLab for Patient L.M.'s medically unnecessary qualitative (Procedure Code 80307) and quantitative (Procedure Code G0483) testing between August and September 2021.

89.   A comparison of Exhibit 2 (billing records relating to L.M.'s drug testing through Thoroughbred) and Exhibit 3 (billing records relating to L.M.'s stay at Edgewater) corroborates the fact that urine drug testing requisition forms were falsely filled out to consistently reflect a diagnosis of F11.20 (Opioid Dependence), even when patients did not suffer from that disorder.   According to Edgewater's billing for L.M., who was fresh off multiple methamphetamine (a stimulant) convictions, his diagnosis was F15.20 (Other Stimulant Dependence).   Yet, AccuLab d/b/a Thoroughbred billed L.M.'s testing under F11.20 (Opioid Dependence).   This practice of false diagnosis attribution is described in more detail herein, below.[4]

90.   Exhibit 4 (Thoroughbred test results relating to L.M.) shows that despite the fact L.M. consistently tested negatively on qualitative tests for all major categories of drugs of abuse (including his drug of choice, methamphetamine), his urine samples were

---

[4] As is described in more detail in connection with the grant fraud alleged in this Complaint, an untrained, unqualified student counselor later added diagnosis code F11.21 (Opioid Use Disorder, Moderate, In Sustained Remission) to L.M.'s Master Treatment Plan and that diagnosis was eventually utilized to falsely justify KORE grant funding for MAT services that were never provided.   In short, Edgewater was treating L.M. for stimulant abuse; yet records were created to justify false application for federal treatment grant money.

nevertheless needlessly and steadily subjected to more expensive quantitative testing for 60-plus substances. Not surprisingly, those quantitative tests consistently yielded unremarkable results.

91.    And the needless quantitative testing of specimens that had already yielded negative qualitative results was not limited to L.M. Exhibit 9 highlights a sampling of other patients who, despite testing appropriately on qualitative tests, nevertheless had specimens that underwent unnecessary 60-plus-panel quantitative testing.

92.    Edgewater employed "peer support specialists" who acted as peer counselors. Upon information and belief, Thoroughbred incentivized Edgewater's utilization (and overutilization) of Thoroughbred's urine drug testing services by separately paying the peer support specialists to collect urine samples on site at Edgewater's locations; fill out test requisition forms with standardized, falsely predetermined diagnosis codes; select standardized, predetermined, overly vigorous test panels; and package and ship the samples to Thoroughbred, among other things. These collection services typically occurred during the peer support specialists' normal Edgewater work hours. Thoroughbred's pay to the peer support specialists to act as specimen collectors benefitted Edgewater inasmuch as Thoroughbred's pay tended to augment Edgewater employee pay and subsidize Edgewater's payroll expenses.

93.    Thoroughbred's Regional Service Representative trained the Edgewater employees on how to collect the urine samples and specifically instructed them to place the same diagnosis code, F11.20 (Opioid Use Disorder) on every Thoroughbred requisition form. Of course, this code was entirely false for Edgewater's clients who suffered from Stimulant Dependence (F15.20), Alcohol Dependence (F10.20), and a host of other disorders that did not involve opioids. The rote application of the Opioid Use Disorder

code on all laboratory requisition forms also exaggerated the ostensible risks of opioid usage/relapse/overdose when the code was falsely applied to clients who were in long-term remission. Active opioid users/addicts suffer from Opioid Use Disorder (F11.20); however, individuals who have been opioid-free for 12 months or more are properly diagnosed as F11.21 (Opioid Use Disorder in Long-Term Remission), not F11.20. Application of the misleading F11.20 code to patients in long-term remission made lower risk clients appear as if they were at high risk for usage/relapse/overdose and thereby tended to justify or deflect scrutiny of impermissibly vigorous, expansive, and frequent testing that fell outside medical necessity standards.

94.     For reasons complementary to the falsification or exaggeration of opioid use disorder diagnosis codes described herein, above, Thoroughbred's Regional Service Representative also trained collectors to falsely add diagnosis code Z79.899 underneath F11.20 on every urine drug test requisition form. According to the ICD-10-CM (International Classification of Diseases, Tenth Revision, Clinical Modification), Z79.899 should be applied to patients that require, among other possibilities: high-risk medication monitoring; long-term anti-depressant or anti-psychotic medication; or active opioid agonist therapies such as methadone or buprenorphine. Without question, the addition of this code denotes a high-need, high-risk patient and its rote application to Edgewater clients who did not exhibit the hallmarks of Z79.899 designation exaggerated their disease states and thereby tended to falsely justify or deflect scrutiny of impermissibly vigorous, expansive, and frequent testing. Of course, Edgewater did not offer Medication Assisted Treatment (MAT) involving opioid agonists like methadone or buprenorphine and its clients were not generally on these sorts of medications. Nor were the vast majority of Edgewater's patients on anti-psychotic medications, and the like, or otherwise qualified for the Z79.899 diagnosis code.

95.     Exhibit 5 contains copies of two exemplar forms that Thoroughbred's Regional Service Representative provided to one of the urine collectors when the former traveled to Paducah to train the latter.   Upon information and belief, the Regional Service Representative or her Thoroughbred colleagues provided similar pattern or "go-by" forms to each of the collectors stationed at Edgewater's many locations.   The Regional Service Representative utilized her own name as the "sample patient" as she filled out the example form.   Again, collectors were trained to fill out all requisition forms identically to the example form.

96.     As is also illustrated on Exhibit 5, collectors were trained to mark a box indicating that a doctor's signature authorizing the specific tests ordered was "on file." There were also times when these collectors were separately instructed to utilize a stamp bearing Edgewater's medical director's name or signature and to imprint the medical director's name onto each requisition form.  Upon information and belief, Edgewater's only physician during the relevant time period was Dr. William "Bill" Fannin. The "signature on file" at Thoroughbred (and upon information and belief also at Ready Lab) was that of Dr. Fannin.  Because Fannin was not treating all of Edgewater's clients, the net effect of the system employed by Edgewater, Thoroughbred, and Ready Lab was that a provider was simply signing a blank requisition form that would be recycled over-and-over on test-after-test with no regard for anything other than adherence to a one-size-fits-all, blanket testing protocol.

97.     For the tests of Edgewater's clients to be reimbursable by the Medicare and Kentucky Medicaid programs, the signing provider needed to be providing medical treatment to the clients and using the test results as part of that treatment.  *See* 42 C.F.R. § 410.32(a).  The orders also needed to be customized to individual clients to comply with

Medicare and Kentucky Medicaid's coverage requirements. *See, e.g.*, Local Coverage Determination L36029 (tests performed pursuant to a "blanket order" that is not individualized are "non-covered services"). To be sure, neither Dr. Fannin, nor any other provider who may have signed-off on requisition forms from time to time, was making individualized decisions about the testing needs of each (and likely not any) of Edgewater's clients.

98.     For example, between its opening in January 2021 and Relator's separation in October 2021, Dr. Fannin never set foot into Edgewater's Paducah location. He visited just once when the Paducah facility was still undergoing renovations and was not open to the public. While Fannin had occasional telehealth encounters with Edgewater's Morehead, Flemingsburg, and Pikeville patients relating exclusively to primary care issues, such as sinus infections, rashes, etc., for which, upon information and belief, Dr. Fannin billed federal programs through his separate private medical practice, he never had such telehealth encounters with Edgewater's Paducah patients. Yet, collectors trained by Thoroughbred faithfully checked the "signature on file" box referring to Dr. Fannin on urine drug test requisition forms and, for periods of time, were instructed to stamp Fannin's name onto the requisition forms. This was done even though the physical distance between all of Edgewater's locations made it impossible for Fannin to have been appropriately involved in all the clients' care for which his name was associated for testing requisition purposes.

99.     Nor was Fannin's Medical Director pay, which owner John David Elam of Edgewater confided to Relator was merely $1,200 per month, commensurate with any real level of patient care or involvement. In reality, Edgewater was effectively paying Dr. Fannin for, among other things, his "on-file" signature and it would have been temporally and

physically impossible for him to be meaningfully involved in the care of all of the patients for which he was purportedly formulating, ordering, and authorizing urine drug testing.

100. The processes set forth by Defendants meant the collectors—not the ordering medical provider—were normally responsible for determining which clients were tested, how they were tested, and the frequency of the testing. Dr. Fannin either permitted his name/signature to be utilized on client testing requisitions with which he had no encounters and no basis to make testing decisions or he was unaware his name was being associated with standing, medically unnecessary drug test requisition orders. In either event, the net effect is fraudulent claims for reimbursement were submitted to federal payors for improper tests.

101. Importantly, collectors were also trained to always mark the "Confirm All Drug Classes" and "Screen All Drug Classes" boxes above a 60-plus panel menu of available tests. *See* Exhibit 5. This resulted in ridiculous, nonsensical, medically unnecessary preliminary and confirmatory testing for substances like over-the-counter acetaminophen (a non-narcotic pain reliever), over-the-counter diphenhydramine (an antihistamine for allergy sufferers), and a wide-ranging array of controlled substances when the subject clients had absolutely no history of involvement with those substances. The automatic checking of the "Screen All Drug Classes" box resulted in the drastic overutilization of qualitative testing. The automatic checking of the "Confirm All Drug Classes" resulted in the drastic overutilization of quantitative testing. Collectors were also trained to always check the "Add on Testing" option "Alcohol Testing."

102. These 60-plus quantitative tests, which federal payors reimburse at far higher rates than qualitative tests, were performed on virtually every client Edgewater ever had during the life of its relationship with Thoroughbred and at least four times per month per

30

client. Over and over and over, Thoroughbred, with full knowledge and cooperation of Edgewater ownership and management, conducted qualitative and quantitative tests for wholly unnecessary substances that were either uninformative for the average client's recovery path or were wholly irrelevant and unnecessary given the client's performance in treatment, stage of recovery, length of sobriety, and historical drug(s) of choice. Indeed, these confirmatory tests were performed even when patients tested qualitatively negatively (or otherwise appropriately) for all substances. Billing for such unnecessary services, too, was fraud.

103.     The 60-plus panel panoply of tests was run automatically by Thoroughbred regardless of the fact that the collectors dually paid by Edgewater and Thoroughbred often provided a separate portion of each client's urine specimen to a different laboratory, Ready Lab, for qualitative (*i.e.*, cheaper, positive-or-negative) testing of ten common drugs of abuse. Belying Thoroughbred's knowledge of and complicity in another laboratory receiving a portion of these split-samples and billing for redundant, unnecessary qualitative testing on same, Thoroughbred's Regional Service Representative trained the collectors at Edgewater's locations to collect a sample, pour portions of it into three or four vials, and ship two vials to Thoroughbred and the rest to Ready Lab.

104.     Just as with its own requisition forms, Thoroughbred's Regional Service Representative trained collectors at Edgewater's locations to fill out *Ready Lab's* requisition forms in standardized ways. Consistent with the Thoroughbred form, the Ready Lab form associated with Exhibit 5 lists the diagnosis codes F11.20 and Z79.899 and the Thoroughbred Regional Service Representative's name as the sample patient. Both Thoroughbred and Ready Lab's forms, per Thoroughbred's training and instruction to collectors, were also to list "No Medications Noted," an indication that providers expected

31

no substances to show up during testing of this particular client. Exhibit 5 bears this out. The idea that none of Edgewater's clients were taking any substances that might show up in the testing is, of course, nonsensical and those rote "No Medications Noted" assertions were frequently false.

105.    A collector also advised Relator that he was instructed by a Thoroughbred representative to utilize vials and supplies provided by Thoroughbred to send portions of samples to Ready Lab.

106.    The system implemented jointly by Edgewater, Ready Lab, and Thoroughbred paid no mind to the qualitative testing. Indeed, Ready Lab's results were often so slow as to be of little-to-no value. Thoroughbred often completed the more thorough (albeit often unnecessary) quantitative testing before Ready Lab had even tested the counterpart sample on a qualitative basis. *Compare* dates on qualitative and quantitative test results for split-samples in Exhibit 6. For example, Patient W.S. provided a urine sample on April 9, 2021. Thoroughbred began quantitative testing on April 12, 2021; yet, Ready Lab did not perform qualitative testing on its portion of the W.S. split sample until April 14, 2021. Patient M.M. provided a urine sample on April 6, 2021. Thoroughbred began quantitative testing on April 7, 2021; yet, Ready Lab did not perform qualitative testing on its portion of the M.M. split sample until April 8, 2021. Patient M.M. provided a urine sample on March 18, 2021. Thoroughbred began quantitative testing on March 19, 2021; yet, Ready Lab did not perform qualitative testing on its portion of the M.M. split sample until March 22, 2021. Patient M.M. provided a urine sample on May 14, 2021. Thoroughbred began quantitative testing on May 17, 2021; yet, Ready Lab did not perform qualitative testing on its portion of the M.M. split sample until May 18, 2021. Patient T.C. provided a urine sample on May 14, 2021. Thoroughbred began quantitative testing on May 17, 2021; yet,

Ready Lab did not perform qualitative testing on its portion of the T.C. split sample until May 18, 2021. Patient J.S. provided a urine sample on April 9, 2021. Thoroughbred began quantitative testing on April 12, 2021; yet, Ready Lab did not perform qualitative testing on its portion of the J.S. split sample until April 14, 2021. This lack of synchronicity rendered Ready Lab's qualitative tests redundant, unreasonable, and medically unnecessary at every turn.

107. Relator and a colleague became confused by some of the qualitative urine drug test results they were receiving from Ready Lab. Instead of simple positive and negative results, sometimes Ready Lab's result forms contained reference ranges and substance levels expressed in nanograms per milliliter (*see* examples in Exhibit 6), much like a quantitative analysis. But Ready Lab's results routinely contained nonsensical information like cocaine metabolite results at "-15" within a range of 0.0 to 299.0 ng/ml; "-6" oxycodone metabolite results within that same range; and "-3" THC metabolite results within the range 0.0 to 49.9 ng/ml. Seeking some knowledgeable feedback about what they were seeing in terms of impossible negative-number results on tests ranging from 0.0 ng/ml and up, Relator and a colleague decided to check with Thoroughbred's top official, CEO, E. Alvin Fletcher. Relator and her colleague telephoned Mr. Fletcher, sent him images of the results they were receiving from Ready Lab, and asked him if he could make sense of qualitative test results involving negative numbers. Fletcher took a look at the results, became upset, and said words to the effect of, "This was not the arrangement with Ready Lab. These results shouldn't have reference ranges or definitive levels. I'm going to have to talk to J.D. [*i.e.*, John David Elam] about this." Relator was not surprised by these references to Mr. Elam in connection with Ready Lab's operations because her interactions with Ready Lab staff had always led her to believe Mr. Elam owned and operated Ready Lab. For example, her point

33

of contact at Ready Lab for results inquiries had always referred to Ready Lab as "J.D.'s lab" or "John David's lab." Relator always understood that Ready Lab's Morehead operations occurred from a building in which Mr. Elam had an ownership stake. Elam's involvement in Ready Lab is, of course, confirmed by his registration through CMS's NPI system as Ready Lab's "authorized official" and "member."

108.   Emblematic of the fraudulent vigor employed by the Defendants in their urine drug testing practices, Exhibit 8 contains Thoroughbred test results for patients that, despite having steady success through treatment for as many as five or six months, were nevertheless still being subjected to the same testing vigor they underwent during their first week of treatment. Such wide arrays of qualitative and quantitative tests were wholly unnecessary given these clients' long-term compliances with their treatment plans.

109.   For all the reasons set forth herein, Edgewater, Thoroughbred, and Ready Lab knew, recklessly disregarded, or deliberately ignored: (1) that the urine drug testing of Edgewater clients was not performed for purposes of medical diagnosis or treatment; (2) that practitioners who purportedly authorized the standardized order forms and tests were not providing medical treatment for substance use disorders to the clients and were not using the results of the urine drug tests for medical purposes; and (3) that, even when urine drug tests were run at Edgewater facilities offering behavioral health services, practitioners who purportedly authorized the standardized order forms and tests were not providing medical treatment for substance use disorders to the clients, were not, themselves, overseeing or providing care to the clients, and were not using the results of the urine drug tests for necessary and appropriate medical purposes.

110.   Indeed, Thoroughbred and Edgewater were well aware of the concept of medical necessity as it relates to urine drug testing. On December 23, 2019, Edgewater's

owner and CEO, John David Elam, and Thoroughbred's owner and CEO, E. Alvin Fletcher, signed a laboratory services agreement and master agreement for laboratory services that, among other things, specifically cautioned the parties about the Health Care Fraud Act, the False Claims Act, and the Civil Monetary Penalty Law. As Exhibit 7 illustrates, the master agreement also cautioned:

> **Medical Necessity:** All diagnostic and/or monitoring tests including UDT, ordered by a doctor have to be medically necessary to the diagnosis and treatment of a patient in a given disease state. Medicare and Medicaid will not pay for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member". See: Section 1862(a)(1)(A) of the Social Security Act, 42 U.S.C. Section 1395y(a)(1). Many insurers apply the same definition to determine whether a service is medically necessary.

111. Nonetheless, Thoroughbred and Ready Lab submitted claims for the urine drug tests performed for Edgewater's clients to the Medicare and Kentucky Medicaid programs. These claims were false because the tests were medically unnecessary and performed pursuant to improper blanket orders signed (or purportedly signed) by a medical practitioner who was not providing medical treatment for substance use disorders to the clients, not actually treating the clients at all, or not using the test results for purposes of medical diagnosis or treatment.

112. As a result of the false claims Thoroughbred and Ready Lab submitted, and that Edgewater caused them to submit, the Medicare and Kentucky Medicaid programs paid, upon information and belief, millions of dollars in reimbursements to which they were not entitled.

**B.**     **Federal Grant/Program Fraud**

      **i.**     **Kentucky Opioid Response Effort**

113.    As is described in more detail herein, above, the Kentucky Opioid Response Effort (KORE) is a federally funded program designed to combat the opioid epidemic in Kentucky. KORE funds, which are obtained in large part from SAMHSA, are allocated to treatment providers who provide treatment for opioid use disorders to patients.

114.    Edgewater has repeatedly applied for KORE funding for the treatment of patients who do not suffer from an active, ongoing opioid use disorder. In order to get these patients falsely qualified for KORE funds, Edgewater falsely and systematically creates and presents KORE funding applications on behalf of patients that incorrectly assert that the patients suffer from an opioid use disorder and that the patients are participating in or are in need of Medication Assisted Treatment (MAT). This latter designation should be reserved, in truth, for patients who are participating in methadone, buprenorphine, or similar medication-based opioid treatment. Such MAT participation generally indicates a patient in desperate need of assistance with fighting an opioid use disorder.

115.    In furtherance of its scheme, Edgewater fills out KORE funding applications that falsely state that patients suffering from any number of non-opioid use disorders (such as alcohol or stimulant abuse, for example) instead suffer from opioid use disorder. In some instances, Edgewater falsely certifies that a patient suffers from opioid use disorder even though the patient has been in long-term remission from such a disorder. Edgewater further indicates that its patients are participating in MAT when, in fact, Edgewater does not offer qualifying MAT services and the subject patients are not receiving such services from other providers.

116.    Exhibit 10 highlights that patient W.S. was admitted to Edgewater on June 11, 2021, for disorders involving cocaine and cannabis abuse, and specifically not opioid use. Opioid use disorder was neither justified as a diagnosis upon intake and initial treatment planning nor throughout various weekly treatment updates.   When W.S. successfully graduated from residential treatment and into intensive outpatient treatment on August 11, 2021, Relator again saw no signs of opioid use disorder and made no reference to such on the outpatient treatment plan.   Contrary to the truth of W.S.'s disease state and without Relator's knowledge, another Edgewater staff member who was unqualified to make diagnoses added an opioid use disorder diagnosis to a different record within W.S.'s file on August 9, 2021.   Also on August 9, 2021, Edgewater staff submitted a Treatment Access Program Provider Application Sheet for New Client to KORE.   It was approved by KORE for funding that same date.   Even though W.S. was not suffering from opioid use disorder, Edgewater's August 9 application reflected "Yes" to, "Does the client have an Opioid Use Disorder?"   In the face of W.S.'s lack of opioid use, Edgewater's application also requested funds for MAT (Medication Assisted Treatment) and certified, "Based on the client's eligibility and clinical assessment, I am requesting approval for submitting a Monthly Treatment Reimbursement Request Form for the following services:".   In addition to "MAT," "Room & Board" was indicated as a category of funding on the application.

117.    Much like patient W.S., Edgewater patient A.J. suffered from no opioid use disorder; yet, on January 21, 2021, a KORE Treatment Access Program Provider Application Sheet for New Client was submitted and approved.  Just Like W.S.'s application, A.J.'s application affirmed that he had an opioid use disorder and indicated he was eligible for MAT funding.  *See* Exhibit 11.

118.    As Exhibit 12 illustrates, a KORE Treatment Access Program Provider Application Sheet for New Client was submitted by Edgewater relative to patient M.H. on September 13, 2021. It was approved on September 16, 2021. The application asserted that M.H. suffered from an opioid use disorder and needed funding for MAT. In truth, M.H.'s addiction related to huffing from compressed air dusting canisters. M.H. had no history of opioid use that would have justified the assertions that he had an opioid use disorder and needed MAT.

119.    Exhibit 13 shows that patient J.M. was admitted to Edgewater's Paducah location on January 19, 2021. At that time, Relator completed a thorough American Society of Addiction Medicine (ASAM) intake assessment. J.M. reported a history of using/abusing alcohol, benzodiazepines, hallucinogens, inhalants, methamphetamine, and tobacco. He reported no opioid use. He mentioned snorting heroin one time in November 2020. Because a one-time, otherwise uneventful usage of heroin does not justify a clinical diagnosis of opioid use disorder, Relator diagnosed J.M. with the following upon intake:   Other Unspecified Stimulant Use Disorder, Severe (F15.20); Cannabis Use Disorder, Severe (F.12.20); Other Hallucinogen Use Disorder, Severe (F.16.20); and Generalized Anxiety Disorder (F41.1). The next day, on January 20, 2021, Edgewater submitted a KORE Treatment Access Program Provider Application Sheet for New Client relative to J.M. It was approved for funding that same day. The application falsely indicated that J.M. suffered from an Opioid Use Disorder and was in need of MAT funding. The day after KORE funding approval, another Edgewater employee who is not qualified to make diagnoses added Opioid Use Disorder to the diagnoses listed on J.M.'s Master Treatment Plan.

120.    Exhibit 14 represents a sampling of approved KORE funding applications that all falsely reference MAT funding being justified despite the fact that Edgewater did not

offer true MAT therapies, such as methadone and buprenorphine treatment. All of the patients listed in Exhibit 14 were patients of Edgewater's Paducah location where, as that location's Program Director, Relator is certain MAT was never provided to any patient.

121.    And even though Exhibit 3 (mentioned herein, above in regard to the urine drug testing fraud) shows that Edgewater was billing Medicaid for patient L.M.'s care under a stimulant use disorder code, that patient—a methamphetamine abuser—ended up being approved for KORE funding for MAT and Room & Board via an application that falsely asserted that he was eligible for MAT. *See* Exhibit 15. His original Master Treatment Plan, completed by Relator on July 29, 2021, diagnosed only Ampbetamine-Type Substance Use Disorder, Severe (F15.20) and Other or Unspecified Stimulant Use Disorder, Severe (F15.20) as L.M.'s diagnoses. The false KORE application for grant funding was covered up by amended diagnoses that were entered by another Edgewater employee (a student trainee) after Relator completed L.M.'s initial assessment. Upon information and belief, this student was instructed to make this addition by Edgewater's company-wide Program Director, who was then acting as the student's academic overseer/liaison/sponsor through the student's university. This same company-wide director repeatedly pressured Relator to think liberally about diagnosing opioid use disorder specifically because such was a prerequisite for grant funding. Of course, despite the addition of the student's unqualified diagnosis entry, there are no medication assisted treatment (MAT) modalities for methamphetamine addicts and Edgewater was not actually treating L.M. for any ongoing opioid use issues.

122.    The net effect of the above is that Edgewater presents applications for KORE funding for patients who would not, but for the falsities on the applications, qualify for such.

### ii.    Operation UNITE

123.    As is detailed herein, above, Operation UNITE serves 32 counties in Southeastern Kentucky and receives federal funding from the Department of Health and Human Services that, at least in part, is utilized to fund UNITE Treatment Vouchers. A precondition of voucher eligibility is that the patient must certify that he/she has lived in one of UNITE's 32 covered counties within the 30-day period immediately preceding the application for voucher funding.

124.    The 32 UNITE counties are Bell, Boyd, Breathitt, Carter, Clay, Elliott, Floyd, Harlan, Jackson, Johnson, Knott, Knox, Laurel, Lawrence, Lee, Leslie, Letcher, Lincoln, Magoffin, Martin, McCreary, Menifee, Morgan, Owsley, Perry, Pike, Pulaski, Rockcastle, Rowan, Wayne, Whitley and Wolfe.

125.    Edgewater's Morehead (Rowan County) and Pikeville (Pike County) locations are within the UNITE catchment area. Edgewater's Paducah (McCracken County) and Flemingsburg (Fleming County) locations are outside UNITE's coverage zone, although the Fleming County location is near enough to the catchment are to be an approved UNITE provider of drug treatment services. On the other hand, Paducah is approximately 250 miles west of the closest UNITE county (Lincoln) and Edgewater's facility there is not an approved UNITE provider.

126.    To secure UNITE Treatment Vouchers, Edgewater forced patients who were succeeding and progressing through the graduated steps of Edgewater's Paducah program to inexplicably be transferred to its Morehead facilities. Lifelong residents of Paducah and surrounding Western Kentucky communities were pulled hundreds of miles away from their families, support networks, opportunities, and trusted treatment providers for no reason other than to generate UNITE voucher income for Edgewater. Edgewater's

Paducah facility was well-suited to provide successful patients graduated, step-down levels of care. Had UNITE administrators been aware of the true circumstances of Edgewater's patients' moves to Morehead—moves that threatened their recoveries, long-term sobrieties, and their very lives—the agency would not have provided voucher funding to Edgewater. Such gerrymandering of recovery beds runs counter to the treatment principles upon which UNITE's treatment arm is built and unnecessary relocations solely for UNITE funding purposes would never have been countenanced by the agency.

127.    Upon information and belief, in other instances, Edgewater simply applied for funding as if the patient was a resident of a UNITE county when, in fact, he/she was not.


## VI.    COUNTS AND DAMAGES

128.    The United States has been damaged by the acts and practices of Defendants, as described above, in presenting, causing to be presented, and conspiring to present false claims, statements, and records to induce the payment for medically unnecessary and unreasonable urine drug testing.  The Defendants' false statements were material to the decision of the United States to cover and reimburse Defendants for the medically unnecessary and unreasonable urine drug tests.

129.    The United States has been damaged by the acts and practices of Defendant Edgewater, as described above, in presenting and causing to be presented false claims, statements, and records to induce payments, directly or indirectly, of federal grant funds for inpatient and outpatient substance abuse treatment that did not meet grant program requirements.

130.    Defendants profited unlawfully from the payment of the claims.

131.   Damages to the federal and state governments are substantial.

## COUNT I

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants)
### (Knowing Presentation of False Billing Records for Payment)

132.   Relator restates and re-alleges the allegations contained herein, above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

133.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

> is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

134.   By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment of medically unnecessary and unreasonable urine drug testing.   Defendants knew that these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

135.   Each claim presented or caused to be presented for reimbursement for the medically unreasonable and unnecessary urine drug tests set forth herein represents a false or fraudulent claim for payment under the FCA.   The claims were for services that were medically unnecessary, unreasonable, performed pursuant to blanket orders signed by a provider who was not using the results for medical diagnosis or treatment, and ineligible for reimbursement.

42

136.    Unaware that Defendants submitted false statements to conceal their illegal and fraudulent behavior, the United States and the States paid and continue to pay the false claims submitted for Defendants' services. These claims would not have been paid but for Defendants' fraud and false statements.

137.    In reliance on the accuracy of Defendants' data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendants.

## COUNT II

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants)
### (Knowing Creation of False Records)

138.    Relator restates and re-alleges the allegations contained herein, above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

> is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

140.    By virtue of the acts described herein, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment of medically unnecessary and unreasonable urine drug testing. Defendants knew that these claims for payment or approval were false, fraudulent, or

fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

141.     Each claim presented or caused to be presented for reimbursement for the medically unreasonable and unnecessary urine drug tests set forth herein represents a false or fraudulent claim for payment under the FCA.

142.     Unaware that Defendants submitted, or caused to be submitted, false records and/or statements to conceal their illegal and fraudulent behavior, the United States and the States paid and continue to pay the false claims submitted for Defendants' services. These claims would not have been paid but for Defendants' fraud and false statements.

143.     In reliance on the accuracy of Defendants' data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendants.

## COUNT III

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C) (Against All Defendants)
### (Conspiring to Commit a Violation of 31 U.S.C. § 3729(a)(1)(A), (B))

144.     Relator restates and realleges the allegations contained herein, above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

145.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

> is liable to the United States Government for a civil penalty of not less than \$[5,500] and not more than \$[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

146.    By virtue of the acts described herein, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. Defendants knew that these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

147.    Unaware of the conspiracy to submit false records and/or statements to conceal their illegal and fraudulent behavior, the United States and the States paid and continue to pay the false claims submitted for Defendants' services.  These claims would not have been paid but for Defendants' fraud and false statements.

148.    In reliance on the accuracy of Defendants' data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendants.

## COUNT IV

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A) (Against Defendant Edgewater)
### (Knowing Presentation of False Records for Payment of Grant Funds)

149.    Relator restates and realleges the allegations contained herein, above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

150.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent
> claim for payment or approval . . .

45

is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person . . .

151.    By virtue of the acts described herein, Defendant Edgewater knowingly presented, or caused to be presented, false or fraudulent applications and claims for payment of substance abuse treatment.  Defendant Edgewater knew that these applications and claims for payment or approval were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

152.    Each claim presented or caused to be presented for payment of grant funds in connection with substance abuse treatment set forth herein represents a false or fraudulent claim for payment under the FCA.  The claims were for services provided to patients that, due to their true diagnoses, disease states, treatments, and locations were ineligible for the grant funds.

153.    Unaware that Defendant Edgewater submitted false statements to conceal its illegal and fraudulent behavior, the grant programs paid and continue to pay in connection with the false claims submitted for Defendant Edgewater's services.  These claims would not have been paid but for Defendant Edgewater's fraud and false statements.

154.    In reliance on the accuracy of Defendants' data, representations, and certifications, the United States and the States have paid said claims and have suffered financial losses because of these acts by Defendants.

## PRAYER AS TO COUNTS I-IV

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendants in Counts I-IV, respectively, for the following:

a.      Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of each Defendants' conduct;

b.      Civil penalties against the Defendants, respectively, equal to not less than $5,500 and not more than $11,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.      The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from the Defendants;

d.      All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure and the Seventh Amendment to the United States Constitution.

DATED:  November 18, 2021

Respectfully submitted,

Brandon W. Marshall
NASH MARSHALL, PLLC
129 West Short Street
Lexington, Kentucky 40507
(859)254-3232
bwmarshall@nashmarshall.com

## CERTIFICATE OF SERVICE

This is to certify that the original of the foregoing was hand delivered on this the

18th day of November, 2021, to:

Office of the Clerk
United States District Court
Eastern District of Kentucky
330 West Broadway Street, #313
Frankfort, KY 40601

This is to further certify that a true and correct copy of the foregoing was mailed via

U.S. Mail, postage prepaid, on this the 18th day of November, 2021, to:

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

This is to further certify that a true and correct copy of the foregoing was hand-

delivered, on this the 18th day of November, 2021, to:

U.S. Attorney
Eastern District of Kentucky
260 West Vine Street, Suite 300
Lexington, KY 40507

_____
Counsel for *Qui Tam* Plaintiff/
Relator

**VERIFICATION**

I, Katherine Coale, PMHNP, Plaintiff/Relator, have read the foregoing *Qui Tam* Complaint and Jury Trial Demand, and hereby verify and confirm that the statements and representations contained herein are true and correct to the best of my knowledge and belief.

*Katharine Coale, PMHNP*
Katherine Coale, PMHNP

COMMONWEALTH OF KENTUCKY )
COUNTY OF McCracken )
)

Subscribed, sworn to and acknowledged before me by Katherine Coale this 17th day of November, 2021.

My commission expires: Sept 21, 2022

*Kayla Dunn*
NOTARY PUBLIC, State at Large

OFFICIAL SEAL
Kayla Dunn
Notary Public ID No. 609249
State at Large, Kentucky
My Commission Expires Sept 21, 2022